07-0404 Exxon Mobil Corp. v. Dan Gill








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 07-0404
════════════
 
Exxon Mobil Corp., 
Petitioner,
 
v.
 
Dan Gill, et al., 
Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Thirteenth District of 
Texas
════════════════════════════════════════════════════
 
 
PER CURIAM
 
 
            
Justice O’Neill and Justice Guzman did not participate in 
the decision.
 
            
For several years, Exxon Mobil Corp. offered service station dealers 
individual rebates based upon a dealer’s sales volume and hours of operation. 
Three Texas dealers, Dan Gill, Howard Granby, and Patrick Morrow (“the 
Dealers”), sued Exxon in the county court at law of Nueces County on behalf of 
all Exxon dealers in the nation, complaining that unbeknownst to them, Exxon 
added the cost of the rebate programs back into the wholesale price Exxon 
charged them for gasoline. The Dealers initially moved to certify a nationwide 
class, but after this Court’s decision in Compaq Computer Corp. v. Lapray, 135 S.W.3d 657 (Tex. 2004), they sought 
certification of only a statewide class, and plaintiffs’ counsel refiled the claims for all other Exxon dealers in the United 
States in federal court. The federal court rendered summary judgment for Exxon. 
Flagler Auto., Inc. v. Exxon Mobil Corp., 582 F. Supp. 
2d 367 (E.D.N.Y. 2008). Meanwhile, the Texas trial court certified a 
class of all Texas dealers, and the court of appeals affirmed. 221 S.W.3d 841 (Tex. App.–Corpus Christi-Edinburg 2007). Because the lower courts did not 
correctly construe and apply our decision in Shell Oil Co. v. HRN, Inc., 
144 S.W.3d 429, 434-436 (Tex. 2004), we reverse and remand the case to the trial 
court.
            
“Courts must perform a rigorous analysis before ruling on class 
certification to determine whether all prerequisites to certification have been 
met.” Sw. Ref. Co. v. Bernal, 22 S.W.3d 425, 435 (Tex. 2000) 
(citation and internal quotation marks omitted). In so doing, courts “may 
look beyond the pleadings.” Intratex Gas Co. v. 
Beeson, 22 S.W.3d 398, 404 (Tex. 2000). “Because class determinations 
generally involve considerations that are enmeshed in the factual and legal 
issues comprising the plaintiff’s cause of action, the trial court must be able 
to make a reasoned determination of the certification issues.” Id. (citation and internal quotation marks omitted). 
And while “[d]eciding the merits of the suit in order 
to determine . . . its maintainability as a 
class action is not appropriate,” Beeson, 22 S.W.3d at 404 (citations 
omitted), “the substantive law . . . must be taken into consideration 
in determining whether the purported class can meet the certification 
prerequisites under [Texas Rule of Civil Procedure] 42,” Union Pac. Res. 
Group, Inc. v. Hankins, 111 S.W.3d 69, 72-73 (Tex. 2003).
            
The parties do not dispute that each dealer’s sales agreement with Exxon 
contained essentially the same open-price provision, obligating the dealer to 
pay Exxon its “established” price or price “in effect” at the time of the 
loading of the delivery vehicle (referred to as the DTW or DTT price, short for 
dealer tank wagon or dealer tank truck). Such provisions are permitted by 
section 2.305 of the Uniform Commercial Code, in Texas, Tex. Bus. & Com. Code § 2.305, 
which states in pertinent part:
 
(a) The parties if they so intend can conclude a contract for 
sale even though the price is not settled. In such a case the price is a 
reasonable price at the time for delivery 
. . . .
 
(b) A price to be fixed by the seller or by the buyer means a 
price for him to fix in good faith.
 
Comment 3 
creates a safe harbor within (b), advising that “in the normal case a ‘posted 
price’ or a future seller’s or buyer’s ‘given price,’ ‘price in effect,’ ‘market 
price,’ or the like satisfies the good faith requirement.” Tex. Bus. & Com. 
Code § 2.305 cmt. 3. See Romo v. Austin 
Nat’l Bank, 615 S.W.2d 168, 171 n.2 (Tex. 1981) (“Although the official 
comments to the Code were not enacted by the Legislature, they serve as a 
valuable aid in construing the statutory language.” (citations omitted)).
            
The Dealers do not contend that they were charged anything other than the 
DTW or DTT price, or that the prices charged were commercially unreasonable in 
amount or discriminatory. Rather, they complain that Exxon promised that the 
rebate programs would provide dealers real economic benefits but recouped the 
rebates by factoring them back into prices without disclosing what it was doing. 
Exxon admits that it took rebate costs into account in setting prices but 
disputes whether the costs were fully recouped and how much dealers knew.
            
The trial court certified a class asserting three claims: (1) breach of 
the sales agreements; (2) breach of section 2.305’s duty of good faith; and (3) 
breach of rebate promises. See 221 S.W.3d 841, 
848. The court of appeals viewed the first two as “the same” — for breach 
of the open-price provisions, id. at 851 — but 
saw the third claim as separate — “for breach of the promise to provide economic 
benefits under the rebate programs,” id. at 852. 
The court of appeals construed all three as claims for breach of contract and 
rejected Exxon’s argument that the Dealers really alleged fraud. Id. at 
849 (“The claims are . . . contract claims, 
not tort claims, as Exxon suggests.”); id. (“plaintiffs have not asserted a cause of action for fraud”); 
id. at 853 (“this is a contract case”). The 
Dealers also tell us in their brief that “Exxon is simply wrong when it argues 
that this breach-of-contract case . . . is a 
fraud case.”
            
The Dealers have a compelling reason to confine their claim to breach of 
contract: generally speaking, to recover for fraud or other misrepresentation, 
plaintiffs must offer evidence that they relied on the defendant’s misconduct. 
See Henry Schein, Inc. v. 
Stromboe, 102 S.W.3d 675, 686 (Tex. 2002). 
Such evidence is often different for each individual, depending on how and what 
each was told, what each knew of the matter, and how each reacted, thus 
precluding the predominance of common issues required to maintain a class action 
under Rule 42(b)(3). See id. at 693-694. 
To recover for breach of contract, proof of reliance is not required.
            
Accepting the Dealers’ assertion that theirs is a contract action only, 
we see no distinction in their claims. They do not allege that Exxon’s promises 
regarding the rebates were a separate contract or modified the sales agreements. 
They do not assert an independent breach-of-contract action based on any 
promises made by Exxon. Their complaint that they never received the rebate 
benefits Exxon promised is simply the basis for their claim that Exxon did not 
act in good faith and therefore breached the open-price provisions. Thus, we 
have before us a single claim for breach of the open-price provisions, and the 
issue is whether the trial court acted properly in certifying it as a class 
action.
            
As noted above, comment 3 to section 2.305 provides that a seller who 
charges a “price in effect” or the like, as Exxon did, acts in good faith “in 
the normal case.” Tex. Bus. & Com. Code § 2.305 cmt. 3. In Shell Oil Co. v. HRN, 
Inc., 144 S.W.3d 429 (Tex. 2004), we explained that “the normal case” is 
generally one that does not involve discriminatory pricing and that:
 
Beyond prohibiting discriminatory pricing, the [UCC] drafters 
wished to minimize judicial intrusion into the setting of prices under 
open-price-term contracts. They understood that requiring sellers in open-price 
industries, such as the oil and gas industry, to justify the reasonableness [of] 
their prices in order to satisfy section 2.305 would mean that in every case the 
seller is going to be in a lawsuit and that every sales contract would become a 
public utility rate case. The drafters reasonably foresaw that almost any price 
could be attacked unless it benefitted from a strong 
presumption. Thus, they adopted a safe harbor, Comment 3’s posted price 
presumption, to preserve the practice of using sellers’ standard prices while 
seeking to avoid discriminatory prices.
 
Id. at 435 (citation and internal quotation marks 
omitted). To avoid having “a jury 
. . . determine in every section 2.305(b) case whether there 
was any improper motive animating the price-setter, even if the prices 
ultimately charged were undisputedly within the range of those charged 
throughout the industry,” we concluded that the required good faith must be 
measured objectively, with reference to commercial realities, rather than 
subjectively, based on the person’s motives or alleged dishonesty. Id. at 435-436 (citation and internal quotation marks 
omitted).
            
HRN involved allegations by service station dealers that Shell Oil 
Co. had violated its open-price contracts, like those involved in the present 
case, by dishonestly setting prices so high that dealers could not remain 
competitive in the market, thereby forcing them out of business to be replaced 
by company-owned stations more profitable to Shell. Id. 
at 432. But the dealers did not claim that the prices charged were 
commercially unreasonable or discriminatory. Their struggles to compete 
effectively did not make the case “abnormal” for purposes of comment 3’s safe 
harbor. Id. at 437-438.
            
The trial court in the present case acknowledged that under HRN, 
“a party merely challenging the commercial reasonableness of an open-price 
without other factors must show price discrimination,” but it distinguished 
HRN because of the Dealers’ “specific claims of dishonesty in fact based 
on Exxon’s promise of a rebate and acts allegedly taken to remove the benefit 
promised.” We do not see the distinction. The dealers’ claims of dishonesty in 
HRN — that Shell was setting prices to drive them out of business — were 
just as specific, and certainly as reprehensible, as those asserted by the 
Dealers in the present case. Here, as in HRN, there is no claim that the 
open prices charged were commercially unreasonable in amount or discriminatory. 
The Dealers here point to nothing in the contracts that prohibited Exxon from 
taking rebate costs into account in setting prices.
            
The court of appeals distinguished HRN because this case involves 
“specific promises of economic remuneration for keeping stores open specified 
hours and selling specified volumes of gasoline.” 221 S.W.3d at 852. But as we have already noted, the Dealers 
do not assert a cause of action for breach of such promises. They disavow any 
claim of fraud, and they do not assert that any promises Exxon made to them 
constituted a contract or modified their sales agreements. The Dealers’ only 
claim is for breach of the open-price provisions, and the question is whether 
Exxon’s alleged failure to disclose that it was setting prices to recoup rebate 
costs may violate section 2.305’s good faith requirement when Shell’s alleged 
practice of setting prices to drive dealers out of business did not. The answer 
is no.
            
Thus, it appears that the Dealers’ claim lacks merit. As noted at the 
outset, a federal district court has already reached this very conclusion in an 
identical case on behalf of all Exxon dealers in the United States outside 
Texas. Flagler Auto., Inc. v. Exxon Mobil Corp., 582 F. 
Supp. 2d 367 (E.D.N.Y. 2008). The federal Eleventh Circuit has held the 
same in a similar case involving a different oil company and rebate, Autry 
Petroleum Co. v. BP Prods. N. Am., Inc., 2009 U.S. App. LEXIS 13978, 2009 WL 1833864 (11th 
Cir. 2009) (per curiam). In 
Autry, as here, dealers complained that the oil company had factored the 
cost of a rebate program back into the prices charged. Citing HRN, the 
court in Autry concluded: “The good-faith safe harbor provided in UCC 
[§ 2-305(2)] would be undermined — and the certainty a safe harbor provides 
would be frustrated — if, without more, an allegation of subjective bad faith 
trumped the normal case presumption of good faith.” Id. 
at *6.
            
The Dealers point to an earlier Eleventh Circuit case, Allapattah Services, Inc. v. Exxon Corp., 333 
F.3d 1248 (11th Cir. 2003), yet another case involving claims by service station 
dealers that an oil company breached “open price” provisions. In that case, the 
company promised to discount its pricing to offset credit transaction charges 
but later withdrew the offset without notice. The court approved class action 
treatment. But Allapattah was different, the 
court later explained in Autry, because there, “Exxon made specific, 
express promises about the way it would adjust its prices,” agreeing that rebate 
costs would not be added back in. Autry, at *5-6. The Dealers in this 
case make no such allegation. To the contrary, they allege that Exxon factored 
rebate costs into prices “secretly,” without disclosing what it was doing.
            
The trial court and court of appeals misconstrued our decision in 
HRN and misapplied it to this case. When a class has been certified based 
on a significant misunderstanding of the law, we have concluded that “remand to 
the trial court is appropriate so that it may determine the effect . . . on the requirements for class 
certification.” BMG Direct Mktg., Inc. v. Peake, 178 S.W.3d 763, 778 (Tex. 2005). 
Accordingly, the trial court’s class certification order is vacated and the case 
is remanded to that court for further proceedings.
 
Opinion 
delivered: November 20, 2009