# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 18, 2022

Lyle W. Cayce
Clerk

No. 21-50960

IN THE MATTER OF: JON CHRISTIAN AMBERSON

JON CHRISTIAN AMBERSON; JON CHRISTIAN AMBERSON PC;
AMBERSON NATURAL RESOURCES, LLC,

*Appellants*,

*versus*

JAMES ARGYLE MCALLEN; EL RUCIO LAND AND CATTLE
COMPANY, LLC; SAN JUANITO LAND PARTNERSHIP, LTD.;
MCALLEN TRUST PARTNERSHIP,

*Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:20-CV-1193

Before JONES, SOUTHWICK, and OLDHAM, *Circuit Judges*.

LESLIE H. SOUTHWICK, *Circuit Judge*:

A bankruptcy court confirmed an arbitrator's award. The district court affirmed. The compelling of arbitration and the commencement of proceedings to confirm the resulting arbitrator's award had been in state

No. 21-50960

court. Prior to a ruling on confirmation, two of the state-court parties filed for bankruptcy, and the case was removed to bankruptcy court. The only issue before us is whether a counterclaim raised in state court should have been arbitrated. The bankruptcy and federal district courts refused to consider that argument, holding that the state court's order compelling arbitration, which had found all claims were subject to arbitration, became conclusive under state law when the objecting party did not seek mandamus review of that order before the arbitration began.

We disagree. State law allows vacatur to be sought because arbitrators exceeded their powers by resolving a claim not covered by the arbitration agreement. Losing on that argument before arbitration does not bar renewing it after. A different vacatur provision relied upon by the lower courts is confusing, but whatever it means, it does not bar reconsideration of arguments about the scope of the arbitration agreement. Thus, the question of arbitrability of the contested claim remains open. The record is sufficiently clear, though, that we address arbitrability here. We hold that the disputed claim was subject to arbitration.

The lengthy analysis that follows is not fully endorsed by the other members of the panel. There are different views as to what parts are necessary or even relevant. In a word, perhaps there are too many words. Nonetheless, Judge Jones' separate opinion concurs in the holding regarding which vacatur provision applies. The entire panel agrees the arbitration award was properly confirmed and we should AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

The debtor and appellant, Jon Christian Amberson, was and may still be a practicing lawyer. His former father-in-law is the appellee, James Argyle McAllen, a south Texas rancher. McAllen and related entities own "the 27,000-plus acre McAllen Ranch . . . once owned by [McAllen's] great-

2

grandfather, for whom the City of McAllen, on the Rio Grande [] near the southern tip of Texas, is named." *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 426 (Tex. 2017). The ranch is part of the 97,000 acres the King of Spain granted in 1799 to Jose Manuel Gomez, whom a McAllen ancestor later married. Margaret McAllen & Mary Margaret McAllen, *McAllen Ranch*, in 4 New Handbook of Texas 363–64 (1996).

Forest Oil Corporation had producing oil and gas wells on over 1,500 acres of the McAllen Ranch for over 30 years; it also operated a processing plant on 5.75 acres of the ranch. *Forest Oil*, 518 S.W.3d at 426. In 2004, McAllen discovered that Forest Oil had secretly been burying toxic and radioactive waste on his land. That same year, McAllen and three entities he controlled brought suit in state court against Forest Oil. The suit was successful though protracted, ending in 2017 with an affirmance by the Supreme Court of Texas of awards of over $20 million to McAllen and other entities against Forest Oil. *Id.* at 427, 432.

Beginning in 2004, McAllen employed Amberson's law firm, Jon Christian Amberson, P.C., to represent him in the lawsuit against the corporation. Over time, McAllen and the Amberson firm executed three attorney engagement agreements. Each had language similar to this: "[a]ny fee dispute arising under this agreement and/or the services rendered for" McAllen by the law firm would be arbitrated.

McAllen, individually, and Amberson's law firm are parties in this litigation, but there are others whom we now identify. McAllen is joined as a creditor and appellee with El Rucio Land and Cattle Company, LLC; San Juanito Partnership, LTD; and McAllen Trust Partnership, all of whom were parties to the litigation against Forest Oil. Joining the Amberson law firm as appellants are Amberson, individually, and Amberson Natural Resources,

LLC ("ANR"). We will describe ANR later. Unless there is a need to distinguish, we will refer to the parties simply as McAllen and Amberson.

The district court found that during the years-long Forest Oil litigation, Amberson and his firm billed McAllen for a significant number of services that were not performed, some ostensibly related to the Forest Oil litigation, some not. Amberson also borrowed large sums of money from McAllen for litigation expenses that he never repaid.

A controversy about another matter — referred to as the "Cannon Grove" transaction — is at the center of this appeal. McAllen sought to defer capital gains taxes through a "Reverse 1031 Exchange," as allowed by federal statute. 26 U.S.C. § 1031. McAllen did not use Amberson to structure the transaction. McAllen needed a non-blood relative to serve as an intermediary and hold an interest in certain property. Amberson agreed to serve as the intermediary, creating ANR specifically for this transaction. The property itself was held by an entity called Cannon Grove Investments, LLC.

McAllen provided ANR with $4,500,000 on March 18, 2009. That money was intended to enable ANR to purchase a 90% stake in Cannon Grove Investments, with the other 10% to be purchased by a McAllen entity. Later, McAllen asked for his money back. Amberson refused, insisting the money had been a gift. McAllen responded the money had been a loan, with the collateral being ANR's 90% Cannon Grove interest.

In January 2015, the Amberson law firm filed suit in Hidalgo County District Court to compel McAllen to arbitrate a dispute over a contingency fee related to the Forest Oil litigation. After a nonsuit and a failed mediation, the Amberson firm refiled its petition in August 2017. McAllen answered and counterclaimed for breach of fiduciary duty, fraud, and theft, joining Amberson individually and ANR as third-party defendants. McAllen also expanded the suit from dealing only with the law firm's claim for fees relating

No. 21-50960

to the Forest Oil litigation by counterclaiming for damages relating to the Cannon Grove transaction.

In October 2017, Amberson filed for summary judgment on the Cannon Grove claims, raising various affirmative defenses. Simultaneously, Amberson moved to compel arbitration on all claims except for those regarding Cannon Grove. After a hearing, the Hidalgo County District Court in April 2018 ordered all the claims to arbitration without explanatory analysis. Amberson moved to have the court reconsider or clarify its order. After another hearing, the court in October 2018 denied reconsideration, again without explanation, and reaffirmed that all claims were to be arbitrated. An arbitrator was appointed that same month.

Eight claims among the parties were then arbitrated. In a lengthy decision issued on April 30, 2020, the arbitrator awarded McAllen almost $7,300,000 and also $2,000,000 in attorneys' fees. Further, Amberson was required to convey all his Cannon Grove interests to McAllen. Amberson was awarded nothing. Later, the arbitrator awarded McAllen an additional $1,750,000. The arbitrator stated that the Ambersons "preserved their running objection to the arbitrability of the 'Cannon Grove' transaction." The arbitrator interpreted the court's referral order as barring consideration of arbitrability, which he stated was an atypical bar. He made no decision on whether the claims were properly subject to arbitration.

On May 14, 2020, McAllen moved in Hidalgo County District Court to confirm the award. On July 20, 2020, the day before a hearing on the motion, ANR filed a Chapter 11 petition in the Bankruptcy Court for the Western District of Texas. Three days later, Amberson himself filed under Chapter 11 in the same court. Also on July 20, ANR removed the suit for confirmation to the Bankruptcy Court for the Southern District of Texas. That adversary proceeding was soon transferred to the Western District.

In bankruptcy court, McAllen sought confirmation of the entire award and Amberson sought vacatur of the part of the award relating to Cannon Grove. The bankruptcy court concluded that the only procedure for challenging an order compelling arbitration was by seeking immediate review through a writ of mandamus, making it too late to present that argument in a motion to vacate part of the award. Amberson appealed to the district court, which affirmed. Amberson then timely appealed here.

## DISCUSSION

Amberson makes no complaint here about any part of the arbitrator's award except for the portion based on the Cannon Grove claim. He argues that claim was beyond the scope of the arbitration agreement between the parties. McAllen responds that the challenge to the compelling of all claims to arbitration comes too late and also argues that Amberson invoked the wrong statutory section when seeking to overturn part of the award. Analyzing these arguments will require examining several different sources for meaning. We start, though, with two points the parties did not raise.

*I. Should state courts have been allowed to resolve these issues, and was the Texas Arbitration Act, not the Federal Arbitration Act, the correct enactment?*

Neither party on appeal questions the jurisdiction of the bankruptcy court over the arbitration award. Even so, we must assure ourselves of our own subject-matter jurisdiction and that of the federal courts whose rulings we are reviewing. *Keyes v. Gunn*, 890 F.3d 232, 235 n.4 (5th Cir. 2018).

Shifting this state court dispute into bankruptcy court does not immediately appear the most natural path for confirming an arbitrator's award. Whatever other options could have been pursued, though, "litigants may validly consent to adjudication by bankruptcy courts." *Wellness Int'l Network v. Sharif*, 575 U.S. 665, 674 (2015). In this case, there was actual or implied consent by all parties in the bankruptcy court. Therefore, the

bankruptcy court and the district court had jurisdiction over questions of confirming the arbitration award. So do we.

Another preliminary issue is whether the state or the federal act on arbitration applies, *i.e.*, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, or the Texas General Arbitration Act (usually abbreviated "TAA"), Tex. Civ. Prac. & Rem. Code §§ 171.001–171.098. Under the Supremacy Clause, if the FAA applies, it preempts any inconsistent provision of the TAA. *See Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272 (1995). Each party accepts that the TAA applies because the arbitration clauses specify that the arbitration is "governed by Texas law."

The answer, though, is complicated by the fact that "Texas law" includes the FAA due to Texas courts' incorporating the FAA into their substantive law. *See Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 338 & n.7 (5th Cir. 2004). Texas courts do not read choice-of-law provisions as exclusive of the FAA unless a provision "specifically exclude[s] the application of federal law." *In re L & L Kempwood Assocs., L.P.*, 9 S.W.3d 125, 127 (Tex. 1999). The Supreme Court of Texas once distinguished contractual language requiring "that arbitration occur 'pursuant to the'" TAA from language requiring that arbitration occur "'pursuant to the arbitration laws in your state.'" *In re Olshan Found. Repair Co.*, 328 S.W.3d 883, 890 (Tex. 2010). The former was held to be an exclusion of the FAA, but the latter was not. *Id.*

Generally, a court may accept the parties' agreement on the applicable law. *See Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 747 (5th Cir. 2011). Further, federal preemption is an affirmative defense that must be raised at a sufficiently early time to avoid unfair surprise. *Motion Med. Techs., LLC v. Thermotek, Inc.*, 875 F.3d 765, 771 (5th Cir. 2017). Preemption may be

forfeited by not asserting it. *See American Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 811–12 (5th Cir. 2000). We apply the TAA.

*II. Did Amberson use the wrong section of the Texas Arbitration Act when seeking to vacate the Cannon Grove award, and is there a procedural bar?*

Amberson initiated suit in state court in order that his claims against McAllen under the representation contracts could be arbitrated. Beginning there and continuing at every later stage, he has argued that McAllen's counterclaim regarding the Cannon Grove tax matter was not subject to the arbitration agreements. First, he relies on the fact that the agreements were between McAllen and Amberson's law firm, while the parties to the Cannon Grove transaction were McAllen and Amberson's company, ANR. Second, even if an alter-ego relation is shown among the Amberson parties, Amberson insists the Cannon Grove tax transaction is beyond the scope of arbitration agreements that solely related to fee disputes between client and law firm.

The parties agree that two separate subsections of the TAA that provide for vacating an arbitrator's award are the only possible ones for the argument that the arbitrator should not have considered the Cannon Grove claim. This is the statutory language:

(a) On application of a party, the court shall vacate an award if:

. . .

(3) the arbitrators:

(A) exceeded their powers;

. . .; or

(4) there was no agreement to arbitrate, the issue was not adversely determined in a proceeding [to compel or stay arbitration], and the party did not participate in the arbitration hearing without raising the objection.

Tex. Civ. Prac. & Rem. Code § 171.088.

There is no dispute that the arbitration agreements were validly executed and properly applied to the claims other than the one involving Cannon Grove. The relief sought here is to vacate part of an award because one of the claims resolved by the arbitrator was beyond the scope of the agreements. The question is whether vacatur may be sought under the (a)(3)(A) provision for exceeding arbitrators' powers or must instead be brought under the (a)(4) one for an absence of an agreement to arbitrate. If it is the latter, then is that claim barred because mandamus review of the order compelling arbitration on that claim must be sought immediately?

Answering these questions requires that we interpret a Texas statute. We apply any interpretation made by the state's highest court. *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 518 (5th Cir. 2015). When that court has not declared meaning, our obligation as a federal court is to interpret a state statute in a manner consistent with the method that would be employed by that state's highest court. *Id.*

One additional rule and one additional consideration apply to interpreting the TAA. The rule comes from the TAA itself, which is based on a uniform act prepared by the National Conference of Commissioners on Uniform State Laws. The enactment insists that its terms "shall be construed to effect its purpose and make uniform the construction of other states' law applicable to an arbitration." Tex. Civ. Prac. & Rem. Code § 171.003. The Supreme Court of Texas has applied that provision when interpreting the TAA. *See East Tex. Salt Water Disposal Co. v. Werline*, 307 S.W.3d 267, 272 (Tex. 2010). There, the court reviewed decisions from close to 20 states but found a lack of uniformity. *Id.* at 272–74.

In addition, the Supreme Court of Texas often considers interpretations of FAA provisions when interpreting mirror provisions in the TAA. Even if the court does not adopt them, their relevance is evident. *See,*

*e.g.*, *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 97 (Tex. 2011) (considering for purposes of the TAA, then rejecting *Hall St. Assoc., LLC v. Mattel, Inc.* 552 U.S. 576, 579, 588–89 (2008), which had held that parties could not contract for broader judicial review than provided in FAA).

We search for answers from each of these sources of meaning.

### A. Texas state appellate court interpretations

As a federal court interpreting a state statute, our work is controlled by authoritative pronouncements of that state's highest court. The Supreme Court of Texas has analyzed the meaning of "the arbitrators exceeded their powers" under Section 171.088(a)(3)(A). When the parties have executed an arbitration agreement, the rule is that "[a]n arbitrator derives his power from the parties' agreement to submit to arbitration." *City of Pasadena v. Smith*, 292 S.W.3d 14, 20 & n. 41 (Tex. 2009) (citing *Gulf Oil Corp. v. Guidry*, 327 S.W.2d 406, 408 (Tex. 1959)). The TAA itself states that when a court appoints the arbitrator, as occurred here, that person "has the powers of an arbitrator named in the agreement to arbitrate." Tex. Civ. Prac. & Rem. Code § 171.041(c).

Reasonably, then, "exceeded their powers" would include resolving a claim that the parties' agreement did not grant arbitrators any authority to decide. At least one Texas intermediate court opinion cited in the briefs makes that point. *See Centex/Vestal v. Friendship W. Baptist Church*, 314 S.W.3d 677 (Tex. App.—Dallas 2010). There, though neither party at the time the state district court was considering a motion to compel arbitration argued that any claim was beyond the scope of their agreement, *id.* at 681, one of the parties later moved to vacate because an award was made on claims of non-parties. *Id.* at 682–83. The court of appeals held that arbitrators have the power to decide claims within the scope of the agreement and also those the parties agreed to arbitrate at the time of the motion to compel. *Id.* at 686.

No. 21-50960

There was no suggestion that a court can expand the terms of the agreement, but the parties may agree to expand it themselves.

Other opinions apply Section 171.088(a)(3)(A) to the argument that a claim is not within the terms of an existing arbitration agreement. *See, e.g., Center Rose Partners, Ltd. v. Bailey*, 587 S.W.3d 514, 527–28 (Tex. App.—Houston [14th Dist.] 2019) (applying Section 171.088(a)(3)(A) to whether certain claims were within scope of agreement); *Ruff v. Ruff*, No. 05-18-00326-CV, 2020 WL 4592794, at *8 (Tex. App.—Dallas Aug. 11, 2020) (same). Vacatur sought under (a)(3)(A) may raise other issues, such as whether the agreement authorized the remedies that were imposed. *See Constr. Fin. Servs., Inc. v. Douzart*, No. 09-16-00035-CV, 2018 WL 1096103, at *4 (Tex. App.— Beaumont Feb. 28, 2018).

The only barrier raised by a party to this common-sense reading of "exceeded their powers" is that a more specific provision applies and requires certain predicates. *See* § 171.088(a)(4). We now examine whether that provision has been interpreted to have exclusive application to arbitrators deciding a claim beyond the scope of the parties' agreement.

The Supreme Court of Texas has not needed to interpret the vacatur ground that there was no agreement to arbitrate.[1] Logically, whether there was an agreement at all and the scope of an agreement could be separate statutory issues. We examine Texas court of appeals decisions for guidance. They are not binding in our analysis, but they are worthy of deference unless we are "convinced by other persuasive data that the highest court of the state

---

[1] Five of the court's decisions have quoted this vacatur ground; none applied it. *See Ex parte E.H.*, 602 S.W.3d 486, 492 (Tex. 2020); *Hoskins v. Hoskins*, 497 S.W. 3d 490, 494 (Tex. 2016); *Nafta Traders*, 339 S.W. 3d at 91 n.22; *East Texas Salt Water*, 307 S.W. 3d at 268 n.3.; *CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 237 n.15 (Tex. 2002).

would decide otherwise." *Temple v. McCall*, 720 F.3d 301, 307 (5th Cir. 2013) (quotation marks and citation omitted) (this standard was first stated in *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)). The district court and the parties have cited some Texas intermediate court decisions. We review them now.

The bankruptcy court gave significant weight to *Thomas v. Cook*, 350 S.W.3d 382 (Tex. App.—Houston [14th Dist.] 2011). The bankruptcy court relied on this language: "Thomas also contends that the arbitrator exceeded his authority by addressing all of the causes of action she asserted against Cook. We reject this contention because the trial court properly sent all of the causes of action Thomas asserted against Cook, contract and tort alike, to arbitration." *Id.* at 393. With respect, *Thomas* was not saying that *because* the trial court sent all claims, it was proper for arbitrators to consider them. It simply held that due to the broad construction of arbitration clauses, the trial court did not err in compelling arbitration of all claims. *Id.* We find no useful guidance in *Thomas.*

In addition, the bankruptcy court rejected Amberson's reliance on two Texas court of appeals' decisions analyzing the FAA because neither decision held that an "arbitrator exceeded his authority by deciding claims that the trial court specifically referred to it." *See Ancor Holdings, LLC v. Peterson, Goldman, & Villani, Inc.*, 294 S.W.3d 818, 829 (Tex. App.—Dallas 2009); *Barsness v. Scott*, 126 S.W.3d 232, 241 (Tex. App.—San Antonio 2003). More importantly, though, neither opinion held the opposite, *i.e.*, that mere referral eliminates issues of the scope of the agreement. Further, both courts held that arbitrators' authority is derived from the arbitration agreement; they exceed their powers when they do not limit their decision to what the agreement allows. *Ancor*, 294 S.W. 3d at 829; *Barsness*, 126 S.W. 3d at 241 (both citing *Guidry*, 327 S.W. 3d at 409).

No. 21-50960

In addition, the bankruptcy court determined that Amberson had to seek immediate appellate review of the order compelling arbitration of all claims. We will analyze that holding later.

One other opinion the bankruptcy court discussed made some useful holdings. In the case, a party claimed he never signed the arbitration agreement and thus was not subject to it; the court held this was an argument that no arbitration agreement existed, and Section 171.088(a)(4) applied. *Kreit v. Brewer & Pritchard, P.C.*, 530 S.W. 3d 231, 242–43 (Tex. App.—Houston [14th Dist.] 2017) (citing *Penhollow Custom Homes, LLC v. Hawkins*, No. 05-07-01101-CV, 2008 WL 3020812, at *2 (Tex. App.—Dallas Aug. 6, 2008, pet. denied) (mem. op.). There was no right to seek vacatur on that ground because the objection had not been made to the arbitrator. *Id.* Certainly, the court was correct that absent an objection to the arbitrator, whatever (a)(4) otherwise permits is expressly forfeited. There was no order compelling arbitration, so *Kreit* did not consider its relevance to (a)(4).

In summary, neither lower court in this case nor the parties cite any decisions by Texas appellate courts that support their holdings that Section 171.088(a)(4) applies to the argument that a specific claim was outside the scope of an arbitration agreement.[2] We also discovered none. There is no authority from the Supreme Court of Texas. A few intermediate appellate courts have held that when a claim is not within the scope of the arbitration agreement, vacatur is to be sought under Section 171.088(a)(3)(A). That view is sound textually, but what to make of Section 171.088(a)(4) remains

---

[2] One of the Texas cases cited by the parties had a concurrence that interpreted that language much as did the lower courts in the case before us. *See Southwinds Express Const., LLC v. D.H. Griffin of Tex., Inc.*, 513 S.W.3d 66, 81–82 (Tex. App.—Houston [14th Dist.] 2016) (Frost, C.J., concurring). The parties, though, do not refer to the concurrence, nor, for all the reasons stated in this opinion, do we find it persuasive.

elusive. Also of importance, the fact the TAA is based on a uniform act adds to the sources relevant for guidance when there is no controlling precedent. Our analysis must continue.

### B. *Application of Texas rules of interpretation*

Because the Texas courts have not definitively resolved our interpretive issue, we apply the rules of statutory interpretation employed by the Supreme Court of Texas to determine if a clear meaning can be found. When interpreting state statutes, that court will "rely on the plain meaning of a statute's words as expressing legislative intent unless a different meaning is supplied, is apparent from the context, or the plain meaning of the words leads to absurd or nonsensical results." *Cadena Comercial USA Corp. v. Texas Alcoholic Beverage Comm'n,* 518 S.W.3d 318, 325 (Tex. 2017). In this task, it will "consider the context and framework of the entire statute and meld its words into a cohesive reflection of legislative intent." *Id.* at 326.

To gain context, we examine the statutory reasons for vacating an arbitration award besides those two. The first provision is for vacating when the award is procured improperly, such as by fraud. *See* Tex. Civ. & Prac. Rem. Code § 171.088(a)(1). The second is when the arbitrators were corrupt, biased, or engaged in misconduct. *Id.* § 171.088(a)(2). The third, which includes arbitrators' exceeding their powers, also allows vacatur when the arbitrators made significantly unfair procedural rulings, such as refusing to postpone the hearing when the necessity was shown, refusing to accept material evidence, or prejudicing a party in the manner in which the arbitrators conducted the hearing. *Id.* § 171.088(a)(3)(B)–(D). Each of the other reasons for vacating allows a court to reject an arbitration award when there is a serious question that the arbitrators' decision resulted from improper influences or unfair procedures.

14

The two grounds for vacating at issue here involve less malign conduct than do these others. A plain meaning of "exceeded their powers" would apply to a variety of breaches. Some might be procedural, such as requiring production of documents despite a valid claim of privilege or refusing to hear certain evidence, or it might be ordering a category of relief that was not permitted by the arbitration agreement. Amberson argues arbitrators also exceed their powers when they arbitrate a claim that is beyond the scope of the parties' agreement. That argument starts with the advantage of being a common-sense interpretation, but McAllen insists that context blocks that meaning. The context is (a)(4), which he argues is a specific provision for seeking vacatur when there was no agreement to arbitrate a particular claim. Further, that specific provision comes with procedural hurdles, and McAllen argues it makes no sense for those hurdles to become irrelevant simply by making the same claim under (a)(3)(A).

We start by examining the text for a plain meaning: "there was no agreement to arbitrate, the issue was not adversely determined in a proceeding [to compel or stay arbitration], and the party did not participate in the arbitration hearing without raising the objection." § 171.088(a)(4). The need for an objection in the arbitration was satisfied here, so we ignore it. We see a clear requirement: pre-arbitration, a court must not have made a particular determination about the existence of an agreement to arbitrate. Just what needs *not* to have been determined is unclear, though.

In deciding if there is a plain meaning, we consider rules of grammar and "common meaning," unless absurdity results. *City of Rockwall v. Hughes*, 246 S.W. 3d 621, 625–26 (Tex. 2008) (citing TEX. GOV'T CODE § 311.011(b)). One difficulty here is the triple negative — "*no* arbitration agreement," "*not*," and "*adversely* determined." The first negative — "[t]here was no agreement to arbitrate" — is the vacatur ground. It is not itself an "issue," *i.e.*, a topic for debate, but it is what must be shown by the

party seeking vacatur.

One way to make the text clearer and less clumsy is to disconnect syntactically "there was no agreement to arbitrate" from "the issue." Indeed, we already observed that "there was no agreement" is not even an "issue." The vacatur "issue" here is whether an arbitration agreement existed. "Adversely determining," *i.e.*, rejecting that an agreement existed, would be a finding of no agreement. *Not* rejecting means no court decided there was no arbitration agreement, which includes a finding an agreement did exist. Another reading is that "the issue" should be understood to mean "the argument." Rejecting the argument there was *no* agreement would mean finding there was an agreement. *Not* rejecting reverses course again.

Regardless of all that, the "issue" concerns whether there was an agreement to arbitrate. Even if the bankruptcy and district courts were right that this provision blocks post-arbitration reconsideration of an issue, Amberson did not argue that there was no agreement, only that it did not cover one claim. He has had to add to the text of the vacatur provision that there was no agreement to arbitrate *a specific claim*.

What to make of these difficulties will be analyzed later. It is enough now to conclude there is no plain textual meaning.

### C. *Rules applicable to this uniform act*

Having found neither controlling Texas judicial explication nor plain meaning under the state's rules of interpretation, we consider whether there is a construction that would be "uniform [with] the construction of other states' law applicable to an arbitration." Tex. Civ. Prac. & Rem. Code § 171.003; *see also* Tex. Gov. Code § 311.028 ("A uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it.")

Before examining other states' judicial decisions, we review a decision by the Supreme Court of Texas that interpreted a provision of a different uniform act. *Nathan v. Whittington*, 408 S.W.3d 870, 873 (Tex. 2013). The provisions of that act were to "be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it." *Id.* (quoting Tex. Bus. & Com. Code § 24.012, a section of the Texas Uniform Fraudulent Transfer Act).

The court examined the caselaw from other states interpreting their similar statutory provisions and found no uniformity. It then reviewed comments made by the National Conference of Commissioners on Uniform State Laws that drafted the uniform act. *Id.* at 873-74. The comments in the Prefatory Note to the uniform act stated that the relevant provision was a statute of limitations. *Id.* at 874. After considering that Note, the court concluded the statutory text far better fit the category of a statute of repose, and that is how the court classified it. *Id.*

We will follow a similar path. After some background on the adoption of the TAA, we examine how other UAA states have interpreted the relevant text. We also review the comments of the National Conference of Commissioners but then supplement our analysis by examining a few law-journal articles by the chairman of the drafting committee for the uniform act.

*1. Background of Texas Arbitration Act*

The TAA was enacted in 1965. *See* Acts 1965, 59th Tex. Leg., p. 1593, ch. 689, § 1 (entitling it the "Texas General Arbitration Act"). It was a revision of the 1956 Uniform Arbitration Act. *See* Paul Carrington, *The 1965 General Arbitration Statute of Texas*, 20 Sw. L.J. 21, 60 (1966). Texas is one of 23 states to adopt the 1956 UAA. 1956 Unif. Arb. Act, 7 U.L.A. 99 (2009) (chart of jurisdictions).

No. 21-50960

The 1965 enactment did not revise the text of the two UAA provisions that concern us. These are the relevant vacatur grounds in the UAA:

> (3) The arbitrators exceeded their powers;
>
> . . .
>
> (5) There was no arbitration agreement and the issue was not adversely determined in proceedings under Section 2 and the party did not participate in the arbitration hearing without raising the objection;
>
> but the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

1956 UNIF. ARB. ACT, § 12(a), 7 U.L.A. at 514–15 (2009).

> The TAA as enacted in 1965 used identical language:
>
> (3) The arbitrators exceeded their powers;
>
> . . .
>
> (5) There was no arbitration agreement and the issue was not adversely determined in proceedings under Article 225 and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

Acts 1965, 59th Leg.; ch. 689, § 1, Art. 237.

The TAA was initially codified as Texas Revised Civil Statutes articles 224–238. It was recodified in 1997 as Texas Civil Practice and Remedies Code, Sections 171.001–171.098. Act of May 8, 1997, 75th Leg., R.S., ch. 65, § 1.01; ch. 165, § 5.01, eff. Sept. 1, 1997. The recodification combined Subparts (3) and (4), forming Section 171.088 (a)(3) (A)–(D). That caused Subpart (5) to be codified as Section 171.088 (a)(4). The concluding

No. 21-50960

clarification in Subpart (5) was omitted in 1997.[3]  Importantly, the 1965 TAA vacatur provisions of concern to us are still in effect.

### 2. Decisions from other states

We consider the Texas law to be clear, at least in general terms, on what it means for arbitrators to exceed their powers.  "An arbitrator derives his power from the parties' agreement to submit to arbitration." *Nafta Traders*, 339 S.W.3d at 90.  That principle predates the 1965 TAA.  The state's high court stated in 1959 that "the authority of arbitrators is derived from the arbitration agreement and is limited to a decision of the matters submitted therein either expressly or by necessary implication." *Gulf Oil*, 327 S.W.2d at 408.  The briefing and the lower courts cite little Texas caselaw that either applied or refused to apply the exceeding-powers vacatur ground to an argument that one or more, but not all, claims were outside the terms of the agreement.  To the extent that means the applicability is largely an open question, we have no difficulty stating that the plain statutory text makes the exceeding-powers vacatur ground applicable.

As we earlier explained, the only argument that this straightforward interpretation is wrong is that a different vacatur ground is said to be specifically and solely applicable.  Consequently, we sought opinions from other states for whether they apply the "exceeded their powers" vacatur ground when, as here, the argument is that some but not all of the arbitrated claims were beyond the scope of the agreement.  We did not find many addressing the issue.  We will discuss one.

---

[3] The 1997 recodification also changed "[t]here was no arbitration agreement" to "there was no agreement to arbitrate." *See* Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 5.01, § 171.088 (a)(4).  Caselaw interprets the new phrase still to mean "no arbitration agreement exists." *See, e.g., Kreit*, 530 S.W.3d at 241.

The Virginia Supreme Court held that an arbitrator exceeded his powers in deciding a claim not covered by the arbitration agreement in a construction contract. *Trustees of Asbury United Methodist Church v. Taylor & Parrish, Inc.*, 452 S.E.2d 847, 850 (Va. 1995). The agreement bound the parties to arbitrate all disputes "relating to contract documents." *Id.* at 852–53. A claim based on a quantum meruit theory did not relate to any contract document, and the arbitrator exceeded his powers by deciding it. *See id.* The court also held that the trial court order referring "all matters" to the arbitrator "was void . . . because the trial court could not confer jurisdiction on the arbitrator to adjudicate disputes that were not based on the parties' contract." *Id.* at 852. That all sounds correct to us: arbitrators exceed their powers if they decide a claim the agreement does not include.

We now examine other states' use of the vacatur ground that was held to be exclusive in this case: is a trial court's ordering an arbitration an adverse determination of the issue that there is no arbitration agreement, thus barring examining the scope of the agreement on a motion to vacate? *See* Tex. Civ. Prac. & Rem. Code § 171.088(a)(4).

Our search among all states' judicial opinions was for this phrase from the UAA: "no arbitration agreement and the issue was not adversely determined." There were about 250 opinions. We examined 125 of them as a reasonable sampling. Though many courts may not have quoted that entire phrase when interpreting it, we are not looking for all cases, just a representative group. Of the 125 opinions, there were 81 that quoted at least

this part of the provision but did not interpret or apply it.[4] We will group the remaining ones into different categories.

We discovered only three opinions that applied a provision comparable to Section 171.088(a)(4) in a manner that even approaches what the bankruptcy and district courts did in this case. The analysis in one of them was later overruled, and another at least allowed post-arbitration *appellate* review of the trial court's initial order. The third opinion's support for that approach was an alternative basis for the result. All of them were addressing the argument that there was no enforceable agreement *at all*.

In the first opinion, the court held that because a party had "moved to stay arbitration on the ground that there was no agreement to arbitrate," then had its argument "decided adversely" by the denial of a stay, it could not seek to vacate the award on the basis there was no agreement. *Safeway Ins. Co. v. Am. Arb. Ass'n*, 617 N.E.2d 312, 319 (Ill. App. Ct. 1993). Later, that state's supreme court rejected this reasoning in a different case. *See Salsitz v. Kreiss*, 761 N.E.2d 724, 730–31 (Ill. 2001). It held that a party who fails to take an interlocutory appeal of an order compelling or denying a stay of arbitration "does not lose the opportunity to contest the arbitrability of the dispute in a subsequent appeal from a final judgment of the court confirming the arbitration award." *Id.* at 729–30.

The second opinion held that "adversely determined" meant that a trial court, post-arbitration, could not reconsider its earlier ruling that an enforceable arbitration agreement existed; even so, the statute "preserves the issue of arbitrability for the appellate courts after confirmation of the

---

[4] *See, e.g., Cinatl v. Prososki*, 949 N.W.2d 505, 516 (Neb. 2020); *Marathon Oil Co. v. ARCO Ala., Inc.*, 972 P.2d 595, 600 n.1 (Ala. 1999); *Evans Elec. Constr. Co. v. University of Kan. Med. Ctr.*, 634 P.2d 1079, 1086 (Kan. 1981).

award." *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1046 (Mass. 2010). "[A] party wishing to challenge an order compelling arbitration must wait until the arbitration is completed and the award is confirmed before challenging the order compelling arbitration on appeal." *Id.* at 566–67. Section 171.088(a)(4) is equally susceptible to that interpretation, though *Kauders* may more circumvent than interpret the difficult text.

In the third, the court held that arguing for the first time in a motion to vacate that there was no arbitration agreement was untimely. *Louisiana Safety Sys., Inc. v. Tengasco, Inc.*, No. E2000-03021-COA-R3-CV, 2001 WL 1105395, at *5 (Tenn. Ct. App. Sept. 21, 2001). The court then stated that vacatur on this ground also required that a court had not held before the arbitration that an "agreement did exist." *Id.* Of course, a holding that an agreement *exists* is not a determination of an agreement's *scope*.

In contrast to those, nine opinions involved (as does the case before us) a motion to compel and a later vacatur motion based on there being no agreement or arbitrators exceeding their powers; in each, the court considered the merits of vacatur, usually without analyzing the "adversely determined" provision.[5] A tenth opinion was not in our random sample, but as we earlier discussed, it was identified because it overruled one of the few holdings that vacatur on these grounds was barred. *See Salsitz*, 761 N.E.2d at 724. An eleventh opinion, which was an appeal from a denial of a motion

---

[5] *Anderson v. Banks*, 37 A.3d 915 (Me. 2012); *Boskovich Farms, Inc. v. Taco Bell Corp.*, No. 2010-CA-000754-MR, 2011 WL 2935373 (Ky. Ct. App. July 22, 2011); *Adam Assocs. Int'l, Inc. v. William A. Berry & Son, Inc.*, No. 05-0997-BL52, 2007 WL 1296879 (Mass. Dist. Ct. May 2, 2007); *Miller v. City of Anchorage*, No. 2204–CA–000702–MR, 2006 WL 29190 (Ky. Ct. App. Jan. 6, 2006); *Alexander v. Everhart*, 7 P.3d 1282 (Kan. Ct. App. 2000); *Laszlo N. Tauber, M.D. & Assocs. v. Trammell Crow Real Est. Servs., Inc.*, 738 A.2d 1214 (D.C. 1999); *Graber v. Comstock Bank*, 905 P.2d 1112 (Nev. 1995); *Park Imperial, Inc. v. E. L. Farmer Const. Co.*, 454 P.2d 181 (Ariz. Ct. App. 1969).

No. 21-50960

to compel, has related analysis. *See Layne-Minnesota Co. v. Regents of Univ. of Minn.*, 123 N.W.2d 371, 376–77 (Minn. 1963). When a court, on a motion to compel, finds the agreement unclear, "the issue of arbitrability [should] be initially determined by the arbitrators subject to a party's right reserved in [the vacatur provisions for exceeding powers and for no agreement] to challenge such determination subsequent to any award." *Id.* at 377.

In 17 cases in which there was no pre-arbitration court order, a party was permitted to seek vacatur of an award on the basis that there was no agreement *if* that objection had either been presented to the arbitrators or the party had not participated in the arbitration.[6] These examples are the most clear-cut applications of provisions similar to Section 171.088(a)(4).

The remaining opinions discussed the provision to some extent but not in a manner relevant to this appeal.[7]

---

[6] *Azcon Constr. Co., Inc. v. Golden Hills Resort, Inc.*, 498 N.W.2d 630 (S.D. 1993); *MBNA Am. Bank, N.A. v. Barben*, 111 P.3d 663 (Kan. Ct. App. 2005) (unpublished table decision); *Grad. v. Wetherholt Galleries*, 660 A.2d 903 (D.C. 1995); *GPS USA, Inc. v. Performance Powdercoating*, 26 N.E.3d 574 (Ill. App. Ct. 2015); *Parekh Constr., Inc. v. Pitt Constr. Corp.*, 577 N.E.2d 632 (Mass. App. Ct. 1991); *Migneault v. United Servs. Auto. Ass'n*, 519 P.2d 1162 (Ariz. Ct. App. 1974); *Garlock v. 3DS Props. LLC*, 930 N.W.2d 503 (Neb. 2019); *Smith v. Pinnamaneni*, 254 P.3d (Ariz. Ct. App. 2011); *Bolton v. Bernabei & Katz, PLLC*, 954 A.2d 953 (D.C. 2008); *Westbrook Sch. Comm. v. Westbrook Tchrs. Ass'n*, 404 A.2d 204 (Me. 1979); *Roosa v. Tillotson*, 695 A.2d 1196 (Me. 1997); *Carroll v. MBNA Am. Bank*, 220 P.3d 1080 (Idaho 2009); *City of Lawrence v. Falzarano*, 402 N.E.2d 1017 (Mass. 1980); *Thompson v. Lee*, 589 A.2d 406 (D.C. 1991); *Pelletier & Flangan, Inc. v. Maine Ct. Facilities Auth.*, 673 A.2d 213 (Me. 1996); *University of Ala. v. Modern Constr., Inc.*, 522 P.2d 1132 (Ala. 1974); *Sterling Glob. Sols., LLC v. Parillo*, 2017 IL App (1st) 170397-U, ¶ 1.

[7] *E.g.*, *Seagate Tech., LLC v. Western Digit. Corp.*, 854 N.W.2d 750, 758–59 (Minn. 2014) (the requirement that an objection must be made in the arbitration that applies to "no agreement to arbitrate" does not apply to the other vacatur provisions); *MVR Dev., LLC v. Sanchez*, No. 2 CA-CV 2008-0022, 2008 WL 2932916, at *2 (Ariz. Ct. App. July 30, 2008) (party failed, as an evidentiary matter, to show it had objected to the arbitration); *SIGNAL Corp. v. Keane Fed. Sys., Inc.*, S.E.2d 253, 257 (Va. 2003) (party failed to argue

No. 21-50960

In conclusion, our examination of a large sampling of opinions from other states that adopted the UAA vacatur provisions reveals no opinion that barred a post-arbitration argument that a claim was beyond the scope of the parties' agreement if an objection was made at least in the arbitration itself. Also, despite all the opinions that quote part of the "not adversely determined" vacatur provision, few saw a need to interpret it. We also discussed an opinion allowing a party to argue arbitrators exceeded their powers in arbitrating a claim that was beyond the scope of the agreement.

Other states' views are one component of the analysis. Next, as did the Supreme Court of Texas in *Nathan*, we seek explanations from the National Conference of Commissioners on Uniform State Laws.

### 3. National Conference of Commissioners notes

Uniform acts prepared by the National Conference of Commissioners at times have official comments to each section that guide interpretation: "Although the official comments to the [Uniform Commercial] Code were not enacted by the Legislature, they serve as a valuable aid in construing the statutory language." *Romo v. Austin Nat'l Bank*, 615 S.W.2d 168, 170 n.2 (Tex. 1981). The UAA does not have section-by-section comments, but there is a "Prefatory Note." 1956 UNIF. ARB. ACT, 7 U.L.A. 100 (2009). The important language for us is the Note's last sentence: "The section on Appeals is intended to remove doubts as to what orders are appealable and *to limit appeals prior to judgment to those instances where the element of finality is present*." *Id.* (emphasis added). Insisting, as did the lower courts in this case, that immediate mandamus review of an order compelling arbitration is the sole route to contest that order is contrary to the intended limits.

---

that arbitrators resolved an issue outside the scope of the agreement, instead only arguing that they applied the wrong legal standard).

No. 21-50960

In addition, the first draft of the UAA had explanatory notes to assist the Commissioners as they considered the proposal at their annual meeting in 1954. The revised draft for the 1955 meeting also had notes but only about the revisions. The weight the Supreme Court of Texas would give the notes is unclear. As discussed earlier, that court will consider official comments but reject them if they are not a convincing explanation of the law's text. *See Nathan*, 408 S.W.3d at 874. The comments in the two UAA drafts are similar in form to official comments in completed uniform acts. Still, because the Commissioners did not formally adopt them with the UAA, we will not rely on them. We will, though, briefly review the comments. Learning what this confusing vacatur provision was *supposed* to mean is a worthy place to begin.

In the 1954 first draft, the challenging vacatur provision stated this:

(7) There was no arbitration agreement and the issue was not adversely determined in proceedings under section 2 or waived by participating in the arbitration proceedings.[8]

The "Note" accompanying this vacatur provision said it was "needed" when no court order had preceded the arbitration:

Clause (7) is needed where no proceedings to compel arbitration were taken, the opposing party has not participated in the arbitration hearing, and first interposes his objection on motion to vacate or in resisting a motion to confirm.[9]

---

[8] Unif. Arb. Act § 11(b), at 11 (Nat'l Conf. of Comm'rs on Unif. State Laws, First Tentative Draft 1954), from the University of Minnesota Law Library and the Archives Research Center, University of Illinois. We gratefully identify multiple sources for the 1954 and 1955 drafts. The first found for 1954 was not clearly for that year's meeting; seeking a better 1954 draft at times located only another copy of the 1955 one.

[9] *Id.* § 11, Note, at 13. The Section 11(b)(3) grounds for "exceeded their powers" has no explanation in the Notes, perhaps because of a sense that it needed no explanation.

The provision was later amended to allow participation in the arbitration if the party objected there to the existence of an agreement.[10]  It became Section 12(a)(5) in the UAA and is Section 171.088(a)(4) in the TAA.  Why was it "needed," as the Note states?  Certainly, a reason could have been to make clear that an objector who did not try to stay the arbitration could still move for vacatur because there was no agreement.  We are being urged, though, to imply a far different effect of the provision – a failed objection prior to the arbitration forecloses renewing the objection after.

However, if we interpret the provision that way — a claim that there is no agreement to arbitrate can be asserted only once, either before or after arbitration — it creates tension with the drafters' decision to limit the right to appeal.  The drafters remarked that the New York act, used as a model for some provisions, allowed appeals from *any* order.  First Tentative Draft, *supra* note 9, § 16 Note, at 16 (citing N.Y. Civ. Prac. Act § 1467 (1920)).  The drafters rejected that, saying "the review of orders should be left to an appeal from the final judgment except for those which are final in character or will result in no judgment being entered." *Id.* at 16–17.  Thus, an appeal was allowed from orders denying but not from compelling arbitration.  *Id.* § 16, at 16.  Section 19(a) of the 1956 Uniform Act retained that distinction.

---

[10] "Having raised the objection that no arbitration agreement covering the issue has been made, a party should be permitted to participate in the arbitration hearing without loss of the objection." Unif. Arb. Act § 12(b)(7), Note, at 6 (Nat'l Conf. of Comm'rs on Unif. State Laws, Second Tentative Draft 1955), provided by the National Conference of Commissioners; University of Minnesota Law Library; Archives Research Center, University of Illinois; and University of Iowa College of Law.

In 1956, the UAA was amended one last time solely to delete two vacatur sections; there was no change to the text that concerns us. *See* Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Annual Conference 133–34, 152, 292 (1956).

No. 21-50960

Considering this background, it seems reasonable to conclude that an appeal from an order compelling arbitration was to be allowed ultimately.

When a revised UAA was being prepared in the late 1990's, the drafters regarded "'not adversely determined' . . . [as] superfluous . . . [because when] a court 'adversely determined' in either type of proceeding [*i.e.*, to compel or stay arbitration] that the arbitration agreement was invalid, then no valid arbitration hearing should be held."[11] Thus, the phrase simply identified the vacatur ground as one that could have blocked the arbitration, then noted that no court had yet accepted the argument. Consistent with this understanding, the revised UAA approved in 2000 has an almost identical vacatur provision but with the "adverse determined" phrase removed: "there was no agreement to arbitrate, unless the person participated in the arbitration proceedings without raising the objection" in a timely manner. 2000 UNIF. ARB. ACT, § 23(a)(5), 7 U.L.A. 77 (2009). According to the 1997 Comment, that also is all the 1956 language meant.

Drafters of this 1956 provision were focused on vacatur when no court had compelled arbitration. Its intended relevance otherwise is not at all clear.

---

[11] REVISION OF UNIF. ARB. ACT, Reporter's Comment 76 (NAT'L CONF. OF COMM'RS ON UNIF. STATE LAWS, Draft Oct. 31, 1997), archived at https://www.uniformlaws.org/home. That Comment does not appear in the 2000 UAA itself — once the problematic phrase was deleted, no explanation of its perceived irrelevance was needed. There is a Comment with the new provision: "the right to challenge an award on this ground is conditioned upon the party who contests the validity of an arbitration agreement raising this objection no later than the beginning of the arbitration hearing." 2000 UNIF. ARB. ACT § 23, Comment A.2, 7 U.L.A. 78 (2009).

No. 21-50960

### *4. UAA drafting committee chairman's journal articles*

A useful interpretive source are law journal articles written by the chairman of the committee that drafted the UAA. The articles are especially learned commentary. An example of using learned commentary was a Supreme Court of Texas opinion that needed a definition for "agreement" in the TAA. *See Rachal v. Reitz*, 403 S.W.3d 840, 845 (Tex. 2013).

The chairman of the UAA drafting committee was Professor Maynard E. Pirsig of the University of Minnesota School of Law; he was dean when the UAA drafting began but returned to teaching before it concluded. Maynard E. Pirsig, *The New Uniform Arbitration Act*, 11 Bus. Law. 44 n* (1956). He wrote extensively on the UAA, starting even before its completion in 1956.[12] The Texas Supreme Court likely would consider the committee chairman's explanations but not find them to be definitive.

One of his many useful articles on the UAA is from 1957. Pirsig, *Some Comments on Arbitration Legislation and the Uniform Act*, 10 Vand. L. Rev. 685 (1957). He grouped the problems that can arise about an agreement's scope into three categories. The first was when it was plain that the dispute does not fall within the agreement; in that case, arbitration should be denied. *Id.* at 693. For the second, he gave the example of an arbitration agreement in an employment contract that applies to disputes about wages, but the contested issue concerns employee bonuses. *Id.* at 694. Instead of having a court initially decide whether bonuses are wages, the sole decision for the

---

[12] Maynard E. Pirsig, *Toward a Uniform Arbitration Act*, 9 Arb. J. 115 (1954); Pirsig, *The New Uniform Arbitration Act*, 11 Bus. Law. 44 (1956); Pirsig, *Some Comments on Arbitration Legislation and the Uniform Act*, 10 Vand. L. Rev. 685 (1957); Pirsig, *The Minnesota Uniform Arbitration Act and the Lincoln Mills Case*, 42 Minn. L. Rev. 333 (1958); Pirsig, *Arbitrability under the Uniform Act*, 19 Bus. Law. 763 (1964); Pirsig, *Arbitrability and the Uniform Act*, 19 Arb. J. 154 (1964) (same as the Bus. Law. article).

No. 21-50960

court would be: "Is there an agreement to arbitrate?" *Id.* If there is, then the arbitrator would get the issue of the scope of the agreement, subject to a later objection to the award "that the arbitrator went beyond his powers." *Id.* at 696. The third category concerns a different ambiguity in the agreement, and there too the question should be given to the arbitrator so long as there is an arbitration agreement. *Id.* at 694–95.

In his final article, published in 1964, Pirsig explained that if "the arbitrability of a given dispute was reasonably in doubt, it should initially be passed upon by the arbitrator. His decision, however, should be subject to judicial review at the instance of an objecting party" in a motion to vacate.[13] Pirsig, *Arbitrability under the Uniform Act*, 19 BUS. LAW. 763, 764 (1964). "Nothing is said in these provisions [for resolving a motion to compel] about the need for showing that the pending dispute falls within the agreement to arbitrate. Only an 'agreement to arbitrate' need be proved." *Id.* In fact, when a motion to compel or stay arbitration is filed, "the only question open for judicial consideration should be, are there reasonable grounds shown for the position that the dispute is within the arbitration clause. If there are, then the question is for the arbitrator at this stage, *subject to judicial review if the question is again raised on a motion to confirm or vacate the award*." *Id.* at 764–65 (emphasis added).

---

[13] A 1958 article has a possibly divergent statement. Pirsig wrote that the objection "there was no agreement to arbitrate *the subject matter in dispute* . . . could have been the basis of a motion to compel or stay the arbitration. If such a motion was made and adjudicated, *the point cannot be raised again on a motion to vacate the award*." Pirsig, *Minnesota Uniform Arbitration Act*, *supra* note 12 at 353–54 (emphasis added). In the same article, though, he wrote that the UAA "should limit the court's function on a motion to compel arbitration to determining 'the existence of the agreement to arbitrate.'" *Id.* at 346. At most, then, Pirsig meant the existence of an agreement could not be disputed a second time. The scope of the agreement, however, as the 1964 *Business Lawyer* article we just quoted in the text makes clear, could be judicially reviewed after the arbitration.

In summary, Pirsig wrote that the court on a motion to compel decides on the existence of an arbitration agreement and whether the claims could reasonably fall within its scope. Difficult interpretive tasks about the agreement go to the arbitrator. Once a final award is made, the court can then decide whether the claims were actually within the arbitration clause. The no-arbitration-agreement vacatur ground is generally discussed in situations in which there were no pre-arbitration court proceedings.

We inject a Texas caveat to all this. The Supreme Court of Texas requires that "a party seeking to compel arbitration must establish that a valid arbitration agreement exists *and that the claims at issue fall within the scope of that agreement*." *G.T. Leach Builders, LLC v. Sapphire V.P.*, 458 S.W.3d 502, 524 (Tex. 2015) (citing Tex. Civ. Prac. & Rem. Code § 171.021(a)) (emphasis added). The important point for us, though, is not how much needs to be done by a Texas court when compelling or staying arbitration. Instead, we are analyzing what cannot be undone by a Texas court after arbitration. Any limits on the grounds for vacatur come from the statute.

### 5. The FAA — vacatur grounds and appellate review

A concurring opinion by a Texas Supreme Court justice considered it important that the meaning the court adopted for a TAA provision was consistent with the interpretation given to similar language in the FAA. *East Tex. Salt Water*, 307 S.W.3d at 276 (Willett, J. concurring). One party's argument on how to interpret the TAA had been an invitation to "inject the disruption of needless inconsistency with the FAA. The Court is wise to decline." *Id.* at 277. *See also Nafta Traders,* 339 S.W.3d at 97 (considering the FAA when interpreting a TAA provision). Thus, opinions concerning comparable questions under the FAA may provide useful answers.

Resolving disputes under the FAA about enforcement of arbitration agreements involves two steps. *See Kubala v. Supreme Prod. Servs., Inc.*, 830

F.3d 199, 202 (5th Cir. 2016).  The court is first to decide if there is a valid, enforceable arbitration agreement. *Id.*  That decision is for the court because the issue of contract validity is one of law.  *Id.*; *see also* 9 U.S.C. § 2 (arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract," with an irrelevant exception).  The second step is to decide whether the claims being proposed for arbitration are within the terms of the agreement.  *See Kubala*, 830 F.3d at 202.  Though usually that question also is to be answered by the court, the agreement itself may validly assign the second issue to the arbitrators.  *See id.*

This FAA's distinction between existence and scope of arbitration agreements supports that whatever else the TAA (a)(4) vacatur provision means, it is referring simply to the existence of an agreement, while (a)(3)(A) on exceeding powers applies to all issues of its scope.

The FAA also provides that awards should be vacated "where the arbitrators exceeded their powers."  9 U.S.C. § 10(a)(4). This court has held that "Section 10(a)(4) has been interpreted narrowly and allows vacatur of an award '[o]nly if the arbitrator acts outside the scope of his *contractually* delegated authority — issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract.'" *Kemper Corp. Servs. v. Comput. Scis.*, 946 F.3d 817, 822 (5th Cir. 2020) (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)) (emphasis added).

The arbitration agreement, therefore, is what defines the arbitrator's powers under the FAA.  The analysis of whether those powers have been exceeded must focus on the agreement.  Texas caselaw supports that we should interpret the concept of arbitrators' exceeding their powers under the TAA consistently, if possible, with the interpretation of the FAA.

As to appellate review of allegedly errant orders to compel arbitration, the bankruptcy and district courts held that review had to be sought immediately or not at all. Quite differently, the Supreme Court of Texas has held that orders compelling arbitration under the FAA do not have to be contested immediately by mandamus. *Perry Homes v. Cull*, 258 S.W.3d 580, 586 (Tex. 2008). The court held that such orders could be reviewed after arbitration; to hold otherwise would inundate the courts with "routine mandamus review of such orders," thus "bogging down [arbitration] in preliminary appeals." *Id.* The court relied in part on a section of the FAA that expressly barred interlocutory appeals from orders compelling arbitration. *Id.* (citing 9 U.S.C. § 16(b)(2) (barring such appeals except under 28 U.S.C. § 1292(b)). The court then gave a "*see also*" reference to TAA Section 171.098, which provides for interlocutory appeal only of orders denying, not granting, motions to compel arbitration. *Id.* at 586 n.11. Though waiting until after the arbitration to seek appellate review may waste the parties' resources, "parties may also waste resources appealing every referral when a quick arbitration might settle the matter." *Id.* at 587.

The next year, the court vacated a court of appeals' grant of a writ of mandamus that had stopped an FAA arbitration. *In re Gulf Expl., LLC*, 289 S.W.3d 836, 842–43 (Tex. 2009). "If a trial court compels arbitration when the parties have not agreed to it, that error can unquestionably be reviewed by final appeal." *Id.* at 842. It explained *Perry Homes* this way: "Both federal and Texas statutes provide for vacating an arbitration award by final appeal if the arbitrators exceeded their powers. If appeal is an adequate remedy for an order compelling arbitration, mandamus must be denied." *Id.* Significantly, the court said that "both the federal and state arbitration acts pointedly exclude immediate review of orders compelling arbitration," and therefore mandamus review should be avoided. *Id.*

No. 21-50960

A quite recent opinion by the Supreme Court of Texas concerning an order compelling arbitration was in the context of a state statute for enforcing agreements to arbitrate divorce and child custody disputes. *In re Ayad*, --- S.W.3d ----2022 WL 4393012 (Tex. Sept. 23, 2022) (applying TEX. FAM. CODE §§ 6.601(a), 153.0071(a)).  One spouse argued the agreement was unenforceable, but a trial court compelled arbitration. *Id.* at *2–3.  Citing *In re Gulf* as one of its authorities, the court stated it had "long held that an adequate remedy for a trial court's error in compelling the parties to arbitrate is available through an eventual appeal from a final judgment enforcing an arbitration award." *Id.* at *4.  It is at least suggestive that the state's highest court would make so categorical a statement about the usual rule and rely on an FAA decision when explaining Texas procedures.  Mandamus was granted in the case, though, because the trial court "did not follow a statutory command — unique to the divorce context — that it try issues of validity and enforceability prior to ordering arbitration." *Id.*

When the court made these broad statements in *Ayad* and *Gulf Exploration* about post-arbitration review of orders compelling arbitration, there was no carve-out for orders under the TAA.  It is a telling omission.  It means that, even though there is no FAA provision comparable to the "no arbitration agreement" and "not adversely determined" TAA provision, the Texas high court has stated that postponed review of the order compelling arbitration is available under both acts.  It is unwarranted to place on the rarely interpreted and confusingly phrased (a)(4) vacatur provision the entire weight of an outcome-altering departure from the procedure the Texas high court has applied to the FAA and suggested applies to the TAA.

Of considerable importance to whether we should declare such a departure, "Texas courts applying the FAA follow Texas rather than federal procedure." *In re Palacios*, 221 S.W.3d 564, 565 (Tex. 2006) (citing *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 272 (Tex. 1992)).  Further, "it is

33

important for federal and state law to be as consistent as possible in this area." *Id.* (quotation marks and citation omitted). Therefore, when the Texas high court explains procedures to be followed in state court for the FAA, it is generally explaining the procedure for the TAA, too. These opinions on the FAA explain that the highest court in Texas, for reasons of judicial economy equally applicable to the TAA, disfavors review by a writ of mandamus of orders compelling arbitration. Appellate review can await entry of an award.

One court's contrary view was cited by the bankruptcy court. A Texas court of appeals held that a party "should have" sought a writ of mandamus after the trial court compelled arbitration under the TAA; raising that claim after arbitration was untimely. *Gumble v. Grand Homes 2000, L.P.*, 334 S.W.3d 1, 4 (Tex. App.—Dallas, 2007). In support, the court cited three opinions holding that a writ of mandamus is the only procedure for immediate review of a motion to compel arbitration. *Id.* (citing *Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994); *Mohamed v. Auto Nation USA Corp.*, 89 S.W.3d 830, 834, 838–39 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *In re Godt*, 28 S.W.3d 732, 738–40 (Tex. App.—Corpus Christi-Edinburg, 2000, orig. proceeding)). None of those three, though, addressed whether the order compelling arbitration could also be challenged on a motion to vacate. As far as we can tell, *Gumble* stands alone in holding that mandamus *must* be sought.

We also reiterate the appellate review allowed by the TAA. Appeal is permitted from orders that grant a stay or refuse to compel arbitration but not from their opposites. *See Perry Homes,* 258 S.W. 3d at 586 n.11 (citing § 171.098). Different treatment of the different orders is logical. Staying the arbitration or refusing to order its commencement are final because they prevent arbitration, while refusing to stay or compelling an arbitration are interlocutory since other proceedings follow and an appeal can follow those. Resolving claims without seriatim involvements by a court was a goal for this uniform act. *See* 1956 UNIF. ARB. ACT, 7 U.L.A. 100, Pref. Note (2009).

Allowing a party to wait until arbitration has concluded to seek review of an order compelling arbitration is consistent with that goal.

Prohibiting the appeal of an interlocutory order and also making it unreviewable after final judgment would be an unusually restrictive combination. We conclude that the TAA does not create that dual obstacle at least when the issue is whether a particular claim was subject to arbitration. A writ of mandamus is not required; a later motion to vacate is a remedy.

### D. Proper vacatur provisions for the Amberson claims

With the foregoing analysis of the TAA in hand, we examine Amberson's two vacatur arguments, one on the absence of an alter ego relation, the other on whether the Cannon Grove claim was arbitrable.

The arbitrator made fact findings regarding alter ego. Additionally, even though he determined that he had no authority to resolve whether the Cannon Grove claims were arbitrable, the arbitrator made fact findings relevant to that argument. Fact findings by an arbitrator are nearly unassailable. For example, the grounds for vacatur in the TAA do not include any related to the strength of the evidence to support the award other than if the arbitrator refused to allow introduction of "material evidence." § 171.088(a)(3)(C). The Texas Supreme Court has referred to "judicial review of an arbitration award [as] extraordinarily narrow." *East Tex. Salt Water*, 307 S.W.3d at 271. We conclude that the arbitrator's fact-findings relevant to whether the Cannon Grove claim was subject to the arbitration agreement, a claim he did not resolve, are still entitled to substantial deference.

### 1. Alter ego

When analyzing whether a non-signatory can be forced to arbitrate, the Texas Supreme Court applied Fifth Circuit precedents. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005). Concluding that it was

No. 21-50960

important "for federal and state law to be as consistent as possible in this area, because federal and state courts have concurrent jurisdiction to enforce the FAA," it used "persuasive and well-reasoned federal precedent" to determine state law on the question. *Id.* Though the specific determinations were as to the FAA, we conclude the Texas court would continue its pursuit of consistency and apply the same reasoning to the TAA.

The concept of alter ego is one of the theories "arising out of common principles of contract and agency law" that would bind a non-signatory to an arbitration agreement. *Id.* That is the only theory argued in this case. Determining an alter ego relation is highly fact-based. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003). In making the decision as to corporations, we explained that an alter ego relation would be shown "if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Id.* Comparable analysis applies here both as to the law firm and as to ANR concerning whether they are Amberson's alter ego.

The arbitrator gave these reasons for holding that Amberson's law firm was Amberson's alter ego:

> (1) Amberson is the sole owner and decision maker of the Firm and thus has a financial interest in the Firm and controls its operations; (2) Amberson used the firm and both its operating and IOLTA account to pay and subsidize personal expenses . . . such that there is a unity of interests between the Firm and Amberson; (3) Amberson caused the Firm to be used for the purpose of perpetrating and did perpetrate an actual fraud on the McAllen Parties primarily for his direct personal benefit; and (4) given that Amberson has indicated that the Firm likely cannot pay . . . the amounts awarded herein, it equitably would be a manifest injustice if on this record the McAllen Parties

36

were left with an uncollectible Award or resulting judgment against the Firm.

The arbitrator then made these findings about ANR as an alter ego:

[ANR] was formed for the sole purpose of receiving a $4,500,000.00 loan from McAllen in order to purchase the 90% interest in Cannon Grove . . . .  Amberson is the sole owner of ANR. Amberson provided $500.00 to open up a bank account for ANR. That is the only capital Amberson has provided to ANR. This inadequate capitalization for ANR, coupled with Amberson's total control of ANR, establishes a unity of interest between Amberson and ANR. Whether or not Amberson initially created ANR for the purpose of perpetrating a fraud, ANR ultimately was used for such purpose in connection with Amberson's argument that the $4,500,000.00 amount McAllen paid Amberson's wholly-owned entity ANR was for a gift and was not a loan, which would be for the direct personal benefit of Amberson. Finally, it would be manifestly unjust not to hold Amberson personally liable for ANR's actions.

The arbitrator held that both the law firm and ANR were Amberson's alter egos, making Amberson personally liable for any award granted the McAllen Parties against the firm or ANR.  The bankruptcy and district courts both agreed.

The issue, then, is whether an arbitration agreement existed, *i.e.*, was one enforceable, as to Amberson, individually.  Does this mean we no longer can avoid resolving whether a barrier to review arises from the proviso in Section 171.088(a)(4) that the issue of the existence of an agreement "was not adversely determined in a proceeding" to compel or stay arbitration?  It does not.  The arbitrator's decision on the issue of alter ego must stand, making our authority to review of no consequence.  We explain.

The Texas high court has held that under the FAA, whether a non-signatory is bound by an arbitration agreement is an issue for the court, absent

the agreement's clearly giving the task to the arbitrator. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005). The agreement here was silent. Texas applies its own procedural rules to the FAA. *Id.* Thus, we consider *Weekley Homes* equally applicable to the TAA. A trial court's findings on whether an arbitration agreement exists among specific parties are entitled to deference. *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 204 (Tex. 2021). The bankruptcy court here incorporated the arbitrator's ruling and thus his fact-findings into its own judgment, and we have quoted the findings above. The district court affirmed. Amberson offers little in opposition.

We will not disturb the express findings and the conclusions drawn from them that began with the arbitrator and were sustained by the two federal courts that have already reviewed those findings, that the Amberson law firm and ANR are Amberson's alter ego. Therefore, Amberson himself is obligated to arbitrate any claim that the agreement validly covers.

Therefore, even if Section 171.088(a)(4) bars reconsidering whether an enforceable agreement exists if an order compelling arbitration rejected the argument, the result here would not change. We continue to abstain from deciding on the meaning of that vacatur provision.

### 2. *Scope of the agreement.*

A separate question is whether the arbitration agreements governing the Amberson law firm's work for McAllen apply to the Cannon Grove claims. If they do, then Amberson was validly required to arbitrate them.

We earlier examined the plain language of the vacatur provision for arbitrators' exceeding their powers. *See* § 171.088(a)(3)(A). We also examined Texas caselaw, caselaw from other states adopting the uniform act, journal articles, and interpretations of the FAA, to help understand the alternative (a)(4) provision. Based on all that, we hold that the vacatur

provision for arbitrators' exceeding their powers is the one that applies to the argument that the scope of the agreement did not reach a particular claim.

The only determination so far as to whether the agreement applied to the Cannon Grove claim was by the Hidalgo County District Court when it compelled arbitration. That court provided no analysis. The arbitrator later stated he "made no decision" on arbitrability because the court had already ordered arbitration of all claims. The bankruptcy and district courts each held that the issue was foreclosed because review of an order compelling arbitration could only be sought through mandamus. We have explained our disagreement about the necessity of pursuing mandamus. We have the authority, though, to affirm on any basis supported by the record. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019). The parties on appeal have briefed the merits of the arbitrability issue. As a matter of judicial economy, we will examine the record for whether the application of the arbitration agreement to the Cannon Grove claim is clear.

Under Texas law, a claim is within the scope of an arbitration agreement "if the facts alleged 'touch matters' that are covered by, have a 'significant relationship' to, are 'inextricably enmeshed' with, or are 'factually intertwined' with the contract that contains the arbitration agreement." *In re Bath Junkie Franchise, Inc.*, 246 S.W.3d 356, 366 (Tex. App. — Beaumont 2008) (quoting *Pennzoil Co. v. Arnold Oil Co.*, 30 S.W.3d 494, 498 (Tex. App. — San Antonio 2000, orig. proceeding). For a claim "to come within the scope of the arbitration provision, a party's allegations need only be factually intertwined with arbitrable claims or otherwise touch upon the subject matter of the agreement containing the arbitration provision." *Id.* Perhaps put even more insistently, Texas courts are to find that a claim falls within the scope of the arbitration agreement "*unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue." *Prudential Sec. Inc.*

No. 21-50960

*v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995) (quoting *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir.1990) (emphasis in original).

In brief, in the Cannon Grove transaction, Amberson borrowed $4,500,000 from McAllen in 2009 to purchase a 90% interest in that property, but in 2014 he claimed the money had been a gift. The question is whether that dispute is intertwined with the rest of the arbitration.

There is no dispute that Amberson misappropriated funds from McAllen during the course of the years-long Forest Oil litigation. Claims for recovery of those funds clearly were arbitrable. One of the events discussed by the arbitrator occurred in 2012 when McAllen satisfied a $2,000,000 loan made by First Community Bank to Amberson's law firm. Amberson falsely informed McAllen that the loan had been for Forest Oil litigation expenses. It is undisputed that McAllen borrowed the $2,000,000 from Bank of America, using Cannon Grove as collateral. The arbitrator found Amberson had obtained other financial assistance from McAllen, including a pledge of over $2,000,000 in 2011 as collateral in order for Amberson to get a different bank loan, again by misrepresenting the money was needed for the litigation.

This brief factual summary reveals that Amberson received substantial funds from McAllen by falsely claiming they were for the Forest Oil litigation. McAllen's payments ostensibly for the litigation were used for other purposes. Cannon Grove itself was key to one of the improper payments. We see no basis for treating each of Amberson's fraudulent interactions with McAllen as isolated events. Amberson improperly obtained or retained money from McAllen, using different stratagems at different times, falsely identifying their purpose and their necessity. Also relevant is that the arbitrator held that Amberson individually, his law firm, and ANR formed a civil conspiracy to misappropriate McAllen's funds. Refusing to

return the Cannon Grove money was one act of misappropriation that benefitted those conspirators.

We conclude that the facts of the Cannon Grove claim "'touch matters' that are covered by, have a 'significant relationship' to, are 'inextricably enmeshed' with, or are 'factually intertwined' with the contract that contains the arbitration agreement," which makes them arbitrable. *In re Bath Junkie Franchise*, 246 S.W.3d at 366. Put differently, it *cannot* be said "with positive assurance" that this "arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." *Prudential Securities*, 909 S.W.2d at 899. The arbitration agreement for the Forest Oil litigation was properly applied to the Cannon Grove claim too.

### III. Conclusions

Interpreting the TAA to prohibit renewing the argument, post-arbitration, that a claim was outside the scope of an arbitration agreement finds almost no support in Texas caselaw, in clear text in the TAA, in caselaw from other UAA jurisdictions, in the UAA's Prefatory Note, in the drafting committee chairman's scholarly writings, in the explicit listing in the TAA of what could be appealed prior to arbitration and implicitly what should wait until after, in procedures in Texas for the FAA, and in the general right to challenge interlocutory orders after final judgment. We hold that the TAA allows a party to renew arguments in a motion to vacate that were rejected prior to arbitration about the scope of the arbitration agreement.

We also hold that arbitrators exceed their powers under the TAA when they decide a claim that is outside the scope of the parties' agreement. Consequently, Amberson was entitled under Section 171.088(a)(3)(A) to have the argument considered that the arbitrator had exceeded his powers in resolving the Cannon Grove claim. We do not reverse because we were able to conduct that analysis based on the record before us. There was no error in

arbitrating the Cannon Grove dispute.  Moreover, Amberson individually was subject to the arbitration because ANR and the Amberson law firm are each Amberson's alter ego.

As to Section 171.088(a)(4), regardless of the meaning of "the issue was not adversely determined in a proceeding" to compel or stay the arbitration, what matters is we have found no opinion for a court from Texas or elsewhere, no learned commentary, or anything else that concludes it bars determining the scope of the arbitration agreement after an award is made. Indeed, of all its possible meanings, that may be the least likely.  This oddly worded subsection is rarely discussed in judicial opinions. In the 2000 UAA, the problematic proviso was deleted.

AFFIRMED.

No. 21-50960

Edith H. Jones, *Circuit Judge*, concurring:

Judge Southwick's scholarly opinion illuminates the peculiarities of the Texas Arbitration Act in a way that will be useful to the bench and bar. I concur with much of what he has written. In particular, I agree that pre-arbitration mandamus in state court was not the sole vehicle by which Amberson could challenge the existence and scope of the parties' arbitration agreements. I agree that Section 171.088(a)(3)(A) furnishes the proper basis for analysis of Amberson's arguments in this case, and that under the facts found by the arbitrator, Amberson did not have a valid challenge to the agreement's existence pursuant to Section 171.088(a)(4). And I agree that Amberson was the alter ego of his law firm and ANR and that the Cannon Grove transactions were inextricably intertwined with the Forest Oil fee arbitration agreement. Thus, the judgment of the district and bankruptcy courts is correctly affirmed.

Andrew S. Oldham, *Circuit Judge*, concurring in the judgment:

I would decide this case under Texas Civil Practice and Remedies Code § 171.088(a)(4). It provides for vacatur of an arbitration award if "there was no agreement to arbitrate, the issue was not adversely determined in a proceeding under Subchapter B, and the party did not participate in the arbitration hearing without raising the objection." *Ibid.* This text is most naturally read to authorize vacatur where "there was no agreement to arbitrate [the claim at issue]." Here there was such an agreement, and that "issue" was "adversely determined" against Amberson by a Texas state court. That's the end of this case in my estimation.

I don't understand the relevance of § 171.008(a)(3)(A)'s reference to arbitrators who "exceed their powers." I would not, as the majority does, construe (a)(3)(A) to extend to disputes over the "scope" of an arbitration agreement while limiting (a)(4) to disputes over the "existence" of such an agreement. In my view, both "scope" and "existence" questions fit comfortably within (a)(4).

It's also important, in my view, that Texas's courts have applied § 171.088(a)(4) even where the party fighting an arbitration award raises "scope" questions. *See Southwinds Express Construction*, *LLC v. D.H. Griffin of Texas, Inc.*, 513 S.W.3d 66, 84 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (Frost, C.J., concurring) (explaining that applying § 171.088(a)(3)(A) to circumstances like those in issue here would render portions of § 171.088(a)(4) "meaningless"); *Kreit v. Brewer & Pritchard, P.C.*, 530 S.W.3d 231, 241–43 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (applying § 171.088(a)(4) over (a)(3) where a party raised the "scope" question of whether persons were covered by an agreement).